## KAUFMANN v. TAMES.

District Court, S. D. New York.
Feb. 25, 1932.

Roberts, Cushman & Woodberry, of Boston, Mass., and Cooper, Kerr & Dunham, of New York City (by Arthur D. Thomson, of Boston, Mass., and Thomas J. Byrne, of New York City, of counsel), for plaintiff.

Mock & Blum, of New York City (Asher Blum, of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My judgment is that claims Nos. 1, 2, 4, 5, 6, 7, 8, and 9 of United States patent No. 1,700,535, involved in this cause, are invalid for want of invention, and also by reason of the plaintiff's constructive abandonment of the device which he sought to patent by its commercial sale in substantially the same form more than two years prior to his application for a patent.

Accordingly a decree may be entered dismissing the bill of complaint with costs to the defendant.

I. The Kaufmann patent, on which this suit is founded, was applied for April 26, 1924, and granted as United States patent No. 1,700,535, on January 29, 1929. It relates to an improved protector for mattresses, hereinafter referred to as a sheet, and is designed especially for use on what is known as the Gatch hospital bed, of which the spring has adjustable sections so arranged that the mattress laid thereon may be disposed at such angles as may conduce to the comfortable support of a patient in such different positions as may be necessitated by the nature of his illness, or as may be advisable to give him relaxation achievable from a change of positions unattainable with an ordinary flat rigid bed spring. This bed is illustrated by the left-hand cut in Plaintiff's Exhibit No. 11, and by several cuts in Defendant's Exhibit C.

II. The facts as I find them in this case are as follows:

The plaintiff Kaufmann, under the firm name of Henry Kaufmann & Co., has been in the hospital supply business since 1919 or 1920.

Having been anxious to secure a mattress protector of rubber or rubberized material which would lie smooth on the mattress, he made various experiments between 1919 and 1923, when his model No. 60 Norinkle Rubber Sheet, which is the subject-matter of the patent in suit, was developed.

He testified that for many years the method of protecting mattresses had been to put on them a piece of rubber sheeting sufficient in length to tuck all the way around the mattress. In some cases mattress ticking was used, sewn to the ends of the rubber sheet and tucked under the mattress, and thus the cost of the extra length of rubber sheet was avoided. An example of this form of sheet is Plaintiff's Exhibit No. 6. This was not, however, successful in keeping the sheet smooth.

In 1919 and 1920, the plaintiff succeeded in securing some surplus rubber sheeting which had been used in the manufacture of gas masks during the war. It was of high rubber content and light in weight, but he found it wrinkled more freely than the heavier commercial sheeting which he had used before. He says that it occurred to him that it ought in some way to be possible

smoothly to stretch such a soft light weight sheet over a mattress and he tried it with tensions in the corners of the sheeting as illustrated by Plaintiff's Exhibit No. 7.

The plaintiff testified that he applied for a patent on this form of sheet with the straps in the corners, but subsequently abandoned his application because he found that the sheet did not work satisfactorily. The difficulty was that the diagonal tension did not prevent wrinkling when a patient was heavy or moved about much in the bed.

Finally the plaintiff devised the sheet with divided stretcher rods. This sheet has been marked in evidence as Plaintiff's Exhibit No. 8, and which was the first sheet known as the Norinkle sheet. It differed from the patented sheet, Exhibit No. 3, only in the fact that it had rubber tabs to which the straps were fastened instead of the metal clamps around the rods as in the patent.

This sheet was exhibited at the Hospital Convention at Atlantic City in the autumn of 1922 and was advertised in the Hospital Year Book published in September of that year.

It was there shown, Plaintiff's Exhibit No. 11, as applied to the so-called Gatch bed in which the spring can be raised at two points making the mattress bend accordingly.

On April 22, 1922, more than two years before the date of application for the patent in suit, the plaintiff after exhibiting a sample to Dr. Goldwater, the superintendent of Mt. Sinai Hospital, made a sale to him of fifty Norinkle sheets of the type represented by Exhibit No. 8, and also of the sample which he had shown him, charging therefor $5 apiece less fifteen per cent., making a total sale in the amount of $216.75. This bill was duly paid by the Mt. Sinai Hospital.

I find that this sale was a commercial sale to the hospital, and that the plaintiff's suggestion at the trial that it was merely a sale for the purpose of experiment is an afterthought.

The fact that there was some criticism of these sheets by the authorities at the hospital because the rods were too light and the rubber tabs tended to tear or stretch, and that as a result of this criticism the plaintiff strengthened his rods and improved his means of attaching the straps by substituting the metal clamps which went around the rods in place of rubber tabs does not make the sale of the sheets an experimental sale, but is merely an instance where experi-ence shows that a device has infirmities which can be and are remedied.

As a consequence of these criticisms, in the latter part of 1923, the plaintiff finally developed a sheet of the type, Exhibit No. 3, known as Kaufmann Model No. 60, which is the subject-matter of the patent, and for which he made his application on April 26, 1924.

The defendant testified that he had been in the hospital supply business for about twenty-three years and that his business had been largely limited to uniforms for doctors and nurses. He had seen the plaintiff's Norinkle sheet of the type shown in Exhibit No. 8 at the Hospital Convention, the date of which I have fixed as the autumn of 1922, and later, some time in 1928, a Dr. Landauer, who was a seller of hospital supplies, and, apparently, a friend of the defendant, seems to have shown the defendant the hospital sheet in the form here marked as Exhibit No. 3, with the metal clamps on which were the words "Patent Pending."

The defendant testified further that Dr. Landauer said that there could not be any patent on those clamps as such clamps had been used for years. On investigation by a patent attorney there was not any patent found, and, consequently, the defendant began making his sheet, Plaintiff's Exhibit No. 4, which is almost an exact copy of the plaintiff's sheet, differing only in the use of metal instead of wooden stretcher members.

In the latter part of 1928, the defendant applied for a patent on his sheet, but this was refused on reference to Kaufmann's patent.

The defendant's application is probably the application which is referred to in the file wrapper of the Kaufmann patent, Plaintiff's Exhibit No. 2, at the end whereof, in a letter dated January 5, 1929, the suggestion is made by the Examiner to the Commissioner of Patents that an interference in the Kaufmann application should be allowed because an application had been filed by another party, and that the issue of the Kaufmann patent should be held up pending such interference. There is a notation, however, at the foot of the letter, that the patent in the senior case, the Kaufmann case, should issue, and the junior case be rejected. The patent in suit was, accordingly, granted to the plaintiff on January 29, 1929.

III. The patent has nine claims. Claim No. 3 has been withdrawn. The other eight claims are pressed herein.

Claim No. 1 reads: "1. A protector for mattresses comprising a sheet of flexible pro-

tective material, and stretching and holding means including separate spreading members associated with separate sections of the sheet at the side marginal portions thereof, the oppositely disposed spreading members of the respective sections of the sheet being of substantially equal length, flexible strap members, and means for connecting one of the strap members to each one of the spreading members and to a bed bottom."

Claim No. 2, which is perhaps the broadest of all the claims, reads: "2. A protector for mattresses comprising a sheet of flexible protective material provided at each side with separate hems along separate side marginal portions thereof, separate rod members in said hems, flexible straps, and means for connecting one of the straps to each one of the rod members and a bed."

Claim No. 7 may be considered as stating the plaintiff's patent as applied to a Gatch bed. It reads: "7. The combination with a hospital bed having adjustable sections to support a mattress with sections thereof disposed at an angle to each other, of a mattress protector comprising a sheet of flexible protective material, said sheet at a point intermediate its ends having a slit at either side extending inwardly thereof from its marginal edges, said slits extending in alignment with each other, separate stretching members associated with separate sections of the sheet at each side marginal portion thereof at either side of said slits, flexible strap members, and means by connecting the strap members to said stretching members and the bed, said sheet being adapted to be arranged over the mattress with the slits of the sheet extending transversely in line with the adjoining portions of the sections of the mattress that are disposed at an angle to each other."

I find that the essence of this alleged invention is the insertion of the so-called stretcher members by rods in hems at the ends of the sheet because when tension is applied to these rods by the straps an equal pull along the whole surface of the sheet is effected and it is held smooth. The sheet is made serviceable on the Gatch bed by having the wooden stretcher members or rods made in two sections with a V-shaped notch in the rubber between their ends which if put at the proper point on the mattress enables the sheet to remain smooth when the spring of the Gatch bed is raised and the mattress is bent.

I find further that the straps and clamps are not part of the patent, but are merely appurtenances, which the plaintiff was able to secure from various manufacturers and which would serve his purpose by holding the wooden rods or stretching members tight inside the hems of the sheet when the straps were fastened to the bed under tension.

IV. A comparison of plaintiff's Norinkle sheet made under the patent which was granted to him and which is marked Plaintiff's Exhibit No. 3, with the infringing Melrose Comfit sheet of the defendant, Plaintiff's Exhibit No. 4, shows that they are essentially the same in all respects. Indeed the defendant admits that plaintiff's sheet was both the inspiration and the model of his sheet, Exhibit No. 4, and also, as noted above, that a patent which he sought for his sheet was denied by the Patent Office on reference to the Kaufmann patent in suit here.

There is not any question, therefore, about the infringement, if the plaintiff's patent is not invalid for want of invention, and if the plaintiff did not abandon his essential idea to the public by his sale of a sample and fifty sheets to the Mt. Sinai Hospital on April 22, 1922.

On both these points, however, it seems to me that the defendant must prevail.

V. I hold that the plaintiff's patent was invalid for want of invention. His device was merely such an advance on the prior art as would be expectable of any clever mechanic who was called on to deal with the plaintiff's problem; to make a protective sheet lie smoothly on a mattress.

I endeavored in Hazeltine Corporation v. Radio Corporation (D. C.) 52 F.(2d) 504, 509, 512, to express my point of view with regard to the nature of invention and the elements which necessarily must be present to enable a court to find invention in a given case.

Applying it here, I find that the prior art had in it the French patent of Jean Dalton Foote, published in France, April 6, 1914, and the same patent granted to the same patentee in Great Britain, January 21, 1915.

The essence of the plaintiff's device consists as above found in the use of the stretcher members—the wooden rods inserted in the side seams of the sheet. That is the essence of the Foote patents, also.

In his patents, Foote describes his objective as being to attach a stretcher sheet of rubberized or other appropriate material to a bed in such a manner as to prevent it from wrinkling, puckering, or crumpling under the patient.

The specifications and drawings disclosed rods inserted within a hem at each end of the stretcher sheet as in the plaintiff's sheet, Exhibit No. 3.

The first claim in the French patent reads: "1. Le moyen de fixer un drap à tendeur au lit en maintenant ses extrémités par des barres ou lattes et en fixant les dites barres ou lattes, par des rubans ou par des cordes aux bateaux ou traverses de lit."

This the defendant correctly translates thus:

"1. The method of connecting a stretcher sheet to a bed while holding its ends by means of bars or rigid strips and by securing said bars or rigid strips by means of bands or by cords to the frame or to the braces of the bed."

In the British patent the first claim is: "The means of fitting draw sheets on beds, in such a manner that puckering and wrinkling is prevented, comprising rods or battens attached to the sides of the draw sheets in combination with the means for securing the rods by battens to the bedstead frame, substantially as described."

Here we have disclosed the stretcher members on which the usefulness of the plaintiff's patent is predicated.

There is not and indeed there could not be any claim to the patent on the straps and other accessories purchased by him from various manufacturers; nor on the adaptation of the sheet to the Gatch bed by dividing the stretcher members and having a notch in the rubber between them which would allow the edge of the rubber of the sheet to spread at the point where the mattress bends with the lifting of the Gatch bed spring.

Thus the lack of invention in the plaintiff's patent is made manifest, for earlier foreign patents and publications are part of the prior art whether known or not known to the applicant here. Bone v. Commissioners, etc., 251 U. S. 134, 144, 40 S. Ct. 96, 64 L. Ed. 188; Sirocco Engineering Co. v. B. F. Sturtevant Co., 220 F. 137, 143 (C. C. A. 2). It therefore becomes unnecessary to discuss in detail the American patents cited in the Patent Office and overruled as references by the Board of Appeal, although, having examined these patents, it seems to me that the Board of Appeal erred in reversing the Examiner and granting the patent.

VI. The evidence regarding the sale by the plaintiff of Norinkle sheets in this country more than two years before his application for the patent thereon establishes a constructive abandonment under title 35, U. S. Code, § 31 (35 USCA § 31).

I have already found that the sale of sheets of the type shown in Exhibit No. 8 to the Mt. Sinai Hospital was a commercial sale. This finding is abundantly supported by the plaintiff's admitted contemporaneous attitude in regard to that sale—always a very significant element in the determination of such a question of fact. For it appears from his own testimony in June, 1922, in endeavoring to sell sheets to the Presbyterian Hospital, he referred with enthusiasm to an order which he had previously received from Mt. Sinai Hospital.

Furthermore, it is perfectly obvious that it was not necessary to sell fifty of these sheets in order to make an experiment as to whether they would lie smooth on the Gatch bed or not. The sale of two or three sheets at most would have been adequate for experimental purposes.

The type of sheet, illustrated by Exhibit No. 8, sold by the plaintiff was of substantially the same construction as his patented sheet, Exhibit No. 3. The fact that it was not precisely the same does not prevent the operation of the rule of constructive abandonment, if, as here, the change made between the device sold and the device patented did not amount to invention. International Tooth Crown Co. v. Gaylord, 140 U. S. 55, 62, 11 S. Ct. 716, 35 L. Ed. 347; Hall v. Macneale, 107 U. S. 90, 96, 97, 2 S. Ct. 73, 27 L. Ed. 367; Theberath v. Trimming Co. (C. C.) 15 F. 246, 248, 250.

I hold, therefore, that the sale of sheets of Exhibit No. 8 type on April 22, 1922, more than two years before April 26, 1924, the date of the plaintiff's application for a patent on a sheet of the Exhibit No. 3 type, constituted a constructive abandonment to the public of anything that may have been patentable in the Exhibit No. 3 type of sheet. Smith & Griggs v. Sprague, 123 U. S. 249, 256–258, 8 S. Ct. 122, 31 L. Ed. 141; Egbert v. Lippmann, 104 U. S. 333, 336, 337, 26 L. Ed. 755; Consolidated v. Wright, 94 U. S. 92, 94–96, 24 L. Ed. 68.

Consequently, even if I am wrong in holding the plaintiff's patent invalid for want of invention, it is voided by his own act in making the sale, to which I have above referred.

VII. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½ (28 USCA § 723), and I will sign an order so providing. Hazeltine Corporation v. Radio Corporation

of America (D. C.) 52 F.(2d) 504, 512; Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; Briggs v. United States, 45 F.(2d) 479, 480 (C. C. A. 6). Cf. also, El Sol (D. C.) 45 F.(2d) 852, 856, 857.

Such an order and a decree dismissing the bill of complaint with costs may be presented for signature on three days' notice.