CATAPHOTE CORPORATION, an Ohio corporation, Plaintiff-Counter-Defendant,

v.

DeSOTO CHEMICAL COATINGS, INC., a Delaware corporation, Defendant-Counter-Plaintiff,

Perma-Line Manufacturing Corporation of America, an Illinois corporation, Additional Defendant on Counterclaim.

No. 40985.

United States District Court
N. D. California, S. D.

Oct. 8, 1964.

See also 235 F.Supp. 931.

Merriam, Smith & Marshall, Chicago, Ill., and Lerer & Moltzen, San Francisco, Cal., for plaintiff.

McDougall, Hersh & Scott, Chicago, Ill., and Hoppe & Mitchell, San Francisco, Cal., for defendant.

SWEIGERT, District Judge.

Pursuant to previous order of the Court a separate trial has been had of the defenses of public use and on sale (Title 35 USC § 102(b)).

Since the date of patent application for purposes of this case is November 12, 1957, the critical date involved in this defense is November 12, 1956.

The evidence shows in substance and effect that in 1955 Cataphote had marketed a pavement marking composition after very limited testing but, receiving complaints about it turning black, stopped production and set about looking for a better product.

It found out about a British product and used that formulation in 1955, but, finding it was not sufficiently durable for American volume and traffic weight, closed the line and in late September, 1955, entered into arrangements with Arthur D. Little Co., (hereinafter referred to as Little Co.) to develop a more suitable product.

Between October, 1955 and February, 1956, John A. Poole, an employee of Little Co., and the nominal patentee, developed several formulations, including specific samples recited in the ultimate patent, and transmitted them to Cataphote. Neither Poole nor Little Co., imposed any conditions as to the use of these formulations upon Cataphote or on any persons with whom Cataphote might deal.

Cataphote proceeded to test these formulations by laying them down at various locations in the streets in the vicinity of its Florwood, Mississippi plant.

On February 6, 1956, Cataphote, through its then president, wrote to Little Co. suggesting that chemical research be discontinued as of February 15, 1956, provided that nothing superior to this styrene line was found by that time, and that the balance of the appropriation should be applied to the mechanical division for development of a machine to extrude the line.

The witness, C. H. Searight, now president of Cataphote testifies that this discontinuance letter was orally countermanded by him but the records of Poole and Little Co. significantly show that after February, 1956, there were virtually no work notes of Little Co. on the chemical development for the rest of that year.

In the spring and summer of 1956 Cataphote entered into negotiations with various public agencies—Atlanta, Georgia; Dallas, Texas; Grand Rapids, Lansing and Jackson, Michigan; and Toledo, Ohio—for sale to them of its product.

The negotiations with Atlanta and Dallas had no results but in May, 1956, actual sales and installations were made at Grand Rapids, Lansing and Jackson, Michigan and, later in August, 1956, at Chicago and Des Plaines, Illinois and later in September, 1956, further installations at Toledo, Ohio.

The evidence shows beyond doubt that all of these actual installations constituted not only "public use" and "on sale" of the product, but actual sales of it to these various governmental agencies—sales clearly evidenced by purchase orders and paid for—unless it can be found, as contended by plaintiff Cataphote, that the sales were made, not for

commercial purposes, but only for the purpose of further experimentation and testing of the ultimately patented product.

■■ Although the burden of proving prior "public use" or "on sale" is upon the party alleging such affirmative defense (the defendant DeSoto here), Tucker Aluminum Products, Inc. v. Grossman, 312 F.2d 293 (9th Cir. 1963), it has been held that, where prima facie proof of such defense is met only by the claim that the prior use or on sale was not such within the meaning of the statute because it was for the purpose of perfecting an incomplete invention by tests and experiments, such proof on the part of the patentee should be "full, unequivocal and convincing," Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 264, 8 S.Ct. 122, 31 L.Ed. 141 (1887). See also, Merrill v. Builders Ornamental Iron Co., 197 F.2d 16, 19 (10th Cir. 1952); A. Schrader's Sons, Inc. v. Wein Sales Corp., 9 F.2d 306 (2d Cir. 1925).

Careful consideration of the evidence, both oral and documentary, leads the Court to find and conclude that, although the product was a new product whose saleability in the market required demonstration of its usefulness to prospective customers, the "public use", the "on sale" and the actual sales proven by defendant were not for the mere purpose of experimentation or testing of the ultimately patented product by Poole, Little Co., or Cataphote itself, but were for the commercial purpose of demonstrating to the trade what the patentee and Cataphote then considered to be a completed product already satisfactorily reduced to practice.

The evidence shows that the product had been developed, tested and reduced to practice satisfactorily to Cataphote as early as March or April, 1956, to a point at which Cataphote not only considered discontinuance of further chemical development of the product and transfer of attention to development of more suitable machine to extrude it, but also considered, although for some reason did not make application for, a patent on the product.

The evidence shows that as early as March, 1956, Cataphote was informing the trade, e. g., letter to Dr. Hasli, that it manufactured a plastic line applied hot which was much longer lasting than other products; that in April, 1956, it was inviting purchase orders from cities, e. g., Atlanta, Ga., for whatever size pilot installations of Cataphote "Thermaline" the city felt would enable it, i. e., the city, to adequately evaluate the material; that in May, 1956, it was informing cities, e. g., Dallas, of Cataphote's conditions for a test of "our new striping product",; that by May, 1956, it was establishing selling prices for the product which were listed by September, 1956 and maintained throughout its later marketing; that by June, 1956, it was arranging for letterheads designating the product as its product, the letterheads being ordered in July, 1956, and actually put into use by October, 1956, that by April, 1956, it adopted the trademark "Thermaline" for the product and in June, 1956, it was applying to the Patent Office for a trademark registry on that name and stating in connection therewith that its first use for goods in interstate commerce had been in April, 1956 and that the first application of a commercial nature was at Lansing, Michigan on May 23, 1956.

In May, 1956, the actual installations at Lansing, Grand Rapids and Jackson, Michigan and Toledo, Ohio, were made under arrangements which, according to the correspondence and documents, had all the earmarks of ordinary commercial sales without any contemporaneous indication of a limitation that the sales were for the purpose of further experimentation or testing of the product by Cataphote and with every indication that the sales were pursuant to a Cataphote program to commercially promote the product by such pilot sales as would demonstrate the usefulness, advantages and durability of Cataphote's new product to the purchasers who constituted its obvious market.

In fact, the contemporary correspondence connected with these and the later 1956 sales, refers, not to experimentation, but to "demonstrations". Cataphote did not indicate to any of the purchasers that these and later 1956 sales and installations were for its own experimentation or testing of the product. No evidence was produced from any of the public agencies to show any such understanding or circumstances.

When the material at Lansing and at Grand Rapids eventually wore out after about six months use, Cataphote replaced one and granted a credit for the other.

In August, 1956, similar actual sales and installations were made at Chicago and Des Plaines, Illinois, which were billed by Cataphote on regular open account.

In September, 1956, Cataphote accepted similar purchase orders from the State of Ohio and in November, 1956, installed the product at Toledo and billed for the material.

It is true, as argued by plaintiff, Cataphote, that purchasers of a new traffic product considerably more expensive than conventional paint, would have to be convinced by actual use and demonstration before committing themselves to larger purchases for more extensive use. In fact, some cities, e. g., Atlanta and Dallas, would not purchase any of the Cataphote product.

■ However, as stated in Smith & Davis Mfg. Co. v. Mellon, 58 F. 705 (8th Cir. 1893), a testing of the market, to see how the product will take with the trade is "a trader's, and not an inventor's, experiment. Such a use does not carve an exception out of the statute." See also, Wilkie v. Manhattan Rubber Mfg. Co., 14 F.2d 811 (3rd Cir. 1926).

The fact, therefore, that the total of these first actual sales of the Thermaline product by Cataphote did not exceed about $650 (out of which regular commissions were paid to Cataphote sales representatives in the various markets) is understandable.

Further, it appears from the evidence that during the year 1956 Cataphote was not quite yet in a position to make, deliver and install large sales of Thermaline, not because of the product, itself, but because it had not yet developed a suitable and efficient machine with which to apply the product on the streets in large quantities. It did not develop such a machine until 1957—a fact which largely explains the only definite contemporary claim of experimentation ever made by Cataphote—its correspondence with its sales representatives, Bell and Gustus, at Toledo, Ohio, as late as December, 1956.

This fact tends further to explain why Cataphote did not launch an advertising program to promote the sale of Thermaline until early 1957.

■ In any event, the amount involved in a sale or public use of a product, although it should be considered in determining the true character of the transaction, is by no means the legal test for public use or on sale—nor is mere lack of profit or market success. See Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 24 L.Ed. 68 (1876); Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., 208 F.Supp. 598, 604 (S.D.N.Y.1962), appeal dismissed 2 Cir., 317 F.2d 491.

The evidence shows that except for reports concerning the initial sales and installations, Cataphote maintained no regular or detailed records concerning the performance of the product in use nor did it make any sampling reports on the so-called experimental installations either for itself or for Little Co., or Little Company's employee, Poole, the actual inventor, neither of whom participated in the experiments or in any consultations about the results.

On the contrary, the evidence shows that any interest of Cataphote and its employees in following up on the so-called experimental installations was expressed in a most vague, casual and irregular manner. Only the normal hopefulness of a seller that his product would hold up well in use by the purchasers as distin-

guished from an inventor's check of experiments and tests, is indicated by the evidence.

Although plaintiff contends that it did not determine to market its Thermaline product commercially until about December, 1956, (just within the allowable one year period) it had in September, 1956, shipped the product from New Orleans to Shabrag Co., Teheran, Iran, pursuant to an outright sale transaction for demonstration and sample purposes. Although this foreign "on sale" transaction does not fall within the provisions of Title 35 Sec. 102, it does shed light upon the question whether the other 1956 "on sale" and "public use" transactions in the United States were commercial or experimental.

The Court is of the opinion that the evidence in this case brings it within the ruling of Root v. Third Avenue Railroad Co., 146 U.S. 210, 225, 13 S.Ct. 100, 36 L.Ed. 946 (1892); Tucker Aluminum Products, Inc. v. Grossman, supra; Paraffine Companies v. McEverlast, Inc., 84 F.2d 335, 340 (9th Cir. 1936); Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., 165 F.Supp. 307 (M.D.Ga.1958)—rather than the rulings of City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1877) (distinguished in Root, supra); Beedle v. Bennett, 122 U.S. 71, 77, 7 S.Ct. 1090, 30 L.Ed. 1074 (1886); Servo Corp. of America v. General Electric Co., 220 F. Supp. 473, 482 (W.D.Va.1963); rev'd on other grounds, 4th Cir. 1964, 337 F. 2d 716; Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., supra; Ushakoff v. United States, 327 F.2d 669 (Ct. Claims, 1964); Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp., 316 F. 2d 459, 465 (9th Cir. 1963).

Although plaintiff, Cataphote, now makes the point that the compositions used in these public uses, on sale and sales were not the same compositions as claimed in some of the claims of the patent (e. g., claims 3, 4 and 5, added by the application filed December 18, 1959), Cataphote has previously admitted in its Answers to Interrogatories that all of the Thermaline materials so used and sold were covered by the patent, explicitly stating in Answer to Interrogatory No. 46 that "all sales of Thermoplastic highway marking compositions sold by Cataphote both before and after the issuance of the patents in suit were in accordance with the teachings of the patents in suit or the applications upon which the patents were based."

It was in large part upon this admission and plaintiff's ostensible theory of the case that the issue on separate trial would be merely whether the alleged public uses and on sale were "experimental" in nature that a separate trial of the issue of public use and on sale was ordered by the Court. (See, Memorandum of Decision [on defendant's motion for separate trial of issues]), filed herein May 19, 1964.

Apart from this evidence and this theory of the case, the evidence is further clearly to the effect that Poole was not the inventor of the examples added by the application of December 18, 1959, which form the basis of the specifications of claims 3, 4 and 5. The evidence also clearly shows that the particular form of the product embodied in these claims is a non-substantial variation from Poole's original specifications of November 12, 1957 and, further, that any asserted differences between the composition publicly used, on sale, and sold and other claims of the patent are mere improvements or minor variations.

■ An improvement or mere variation of a minor character in a product, which is not the substance of the patent and does not add anything in itself patentable to it, will not avoid the invalidating effect of a prior public use or on sale. International Tooth Crown Co. v. Gaylord, 140 U.S. 55, 64, 11 S.Ct. 716, 35 L.Ed. 347 (1891); Hall v. MacNeale, 107 U.S. 90, 96, 2 S.Ct. 73, 27 L.Ed. 367 (1882); Lettelier v. Mann, 91 F. 917, 919 (C.C.S.D.Cal.1899); Trimpak Corp. v. Schenectady Lumber Co., 29 F.Supp. 85, 89 (NDNY 1939); Freydberg Bros., Inc. v. Hamburger, 17 F.2d 300, 303 (D. Md. 1927).

In the pending case the Court is convinced that these 1956 public uses, on sales and actual sales of the ultimately patented product were not experimental tests but were commercially designed to promote a market which Cataphote would be ultimately able to exploit on a larger scale when it had developed suitable applicator machinery.

Defendant will prepare proposed findings, conclusions of law and a judgment, serve the same on plaintiff and lodge them with the Court.