**EVERPREST, INC., a corporation, Plaintiff,**

v.

**PHILLIPS–VAN HEUSEN CORPORATION, a corporation, Defendant.**

**Civ. A. No. 975–S.**

United States District Court,
M. D. Alabama, S. D.

July 22, 1970.

See also, D.C., 300 F.Supp. 757.

Truman Hobbs, Hobbs, Copeland, Franco & Screws, Montgomery, Ala.,

Robert H. Berdo, Arnold, Roylance, Kruger & Durkee, Washington, D. C., and C. Preston Allen, Ray, Quinney & Nebeker, Salt Lake City, Utah, for plaintiff.

Carey Chitwood, Martin, Balch, Bingham, Hawthorne & Williams, Birmingham, Ala., Barrett G. Kreisberg, Eugene Frederick Roth and Munson & Fiddler, New York City, for defendant.

## ORDER

FRANK M. JOHNSON, Jr., Chief Judge.

This is an action brought by the plaintiff, Everprest, Inc., against the defendant Phillips-Van Heusen for infringement of United States Letters Patent No. 3,341,955, issued September 19, 1967. Plaintiff is the owner of the patent at issue by an assignment from the inventors, Charles M. Pyke and Frank S. Pyke. Defendant is one of the largest shirt manufacturers in the United States. The plaintiff charges defendant with infringement. The defendant, in its answer, denies infringement and asserts invalidity of the patent. In a counterclaim, the defendant seeks a declaratory judgment that the patent is invalid. The case is submitted upon these issues; the evidence consists of the depositions of several witnesses, the exhibits thereto, and the oral testimony of several witnesses and the exhibits thereto. The case has been thoroughly briefed and argued by the parties. Upon this submission and in this memorandum opinion, as authorized by Rule 52, of the Federal Rules of Civil Procedure, this Court makes appropriate findings of fact and conclusions of law.

This Court has jurisdiction of this patent infringement action under 28 U. S.C. § 1338(a); venue exists under 28 U.S.C. § 1400 in this judicial district where the defendant has manufacturing facilities and where it is accused of infringing the patent in suit.

The subject matter of the patent at issue is indicated by its title, "Producing Wrinkle-Free Permanently Creased Garments". Such garments are commonly known today as "permanent-press" garments. According to the process defined in the claims of the patent, the garment is made from a fabric comprising a blend of either wool or cellulosic fibers and synthetic thermoplastic fibers and containing a synthetic thermosetting resin which is at least partially cured. An example of such fabric is a resin-impregnated blend of cotton and either nylon or Dacron fibers. The fabric is pressed at temperatures between 350° F. and 500° F. for periods of time between one and thirty seconds. The time, temperature and pressure of pressing must be correlated to set at least the thermoplastic fibers into a permanent crease, seam or shape. There are ten claims in the patent in issue, each of which recites a "method of manufacturing an article of wearing apparel from a fabric comprising a blend of cellulosic or wool fibers and synthetic, thermoplastic fibers, said fabric containing synthetic thermosetting resin in at least partially cured state". As stated, the patent in suit was issued September 19, 1967, and was based on a patent application filed on July 21, 1965. The application is asserted to be a "continuation-in-part" of a previous application filed July 21, 1964. The real issue in this litigation is the validity of the patent. The defendant has admitted manufacturing shirts in plants which are located in the Middle District of Alabama, from a fabric as defined in the claims of the patent and has admitted performing the actual physical steps called for in several of the claims of the patent.

The evidence in this case reflects that the introduction of permanent-press garments had a profound effect on the garment and textile industry. The art recognized that the performance of permanent-press garments was a substantial improvement over the garments which had been marketed between 1956 and 1964, and which were designated "wash and wear". The first commercial process for manufacturing garments which imparted a permanent crease and wrin-

kle-free appearance to a garment was known as the "Koratron" process. This was patented in 1961 and was introduced commercially in 1964. According to the Koratron process, garments were produced from fabric impregnated with a thermosetting resin, which resin had not been cured. The garments were fashioned from the fabric, creases were pressed in and the garments were then baked in an oven to cure the resin and thereby impart a permanent crease to the garment. The Pyke brothers, who assigned the patent in suit to the plaintiff, perfected what they referred to as the Everprest process as an alternative to Koratron. After considering various alternatives, the Pyke brothers began to experiment with available pressing equipment, such as steam presses and hand irons. They determined that such equipment did not achieve a successful permanent press because of insufficient temperatures and/or pressures. Subsequently, working with Ajax Presses, a press manufacturer, they were able to obtain on a press sufficiently high temperatures and pressures to achieve a permanent press. This result was achieved on fabrics which had been available since 1956.[1] The "wash and wear" properties were obtained by the utilization of thermoplastic fibers such as nylon or polyesters in the weaving of the cloth. A thermoplastic material is a material having the property of softening when heated and hardening when cooled. A variety of synthetic thermoplastic fibers such as nylon and polyester have been woven into fabrics used in garment manufacturing for years. Such synthetic thermoplastic fibers, because of their properties, can be pressed into creases or into a given condition of smoothness with a warm or hot iron, and will hold these creases during normal service or until pressed flat with an iron having a higher temperature or un-

til otherwise subjected to a temperature higher than that used in forming the crease. It was known in the 1950s that fabrics containing thermoplastics can be set "at temperatures in the range of 375° F. to 425° F." to produce articles of clothing "that are dimensionally stable to repeated washing and ironing".[2]

A thermosetting material is a material having the property of becoming permanently hard and rigid when heated or cured. It has been found, according to the evidence presented in this case, that a variety of thermosetting resins may be combined with cellulosic fiber such as cotton so that the molecules of the thermosetting resin cross-link with the cellulosic fibers, and, when the thermosetting resin is cured or polymerized, the cellulosic fibers with which it has been cross-linked are provided with desired crease resistance.

Garments formed of fabrics comprising a blend of cellulosic or wool fibers and synthetic, thermoplastic fibers, said fabric containing synthetic, thermosetting resin in at least partially cured state, had been used in the manufacture of wearing apparel for several years before the Pykes' patent was issued. Before 1963 a number of garment manufacturers were pressing creases into precured resin fabrics, at temperatures over 350° F. Both Mathews, in his 1954 Edition of Textile Fibers, and the 1952 Edition of American Handbook of Synthetic Textiles disclosed that polyester fibers or the aliphatic fiber-forming polymers are such that:

Essentially permanent creases can be pressed into fabrics at ordinary ironing temperatures (about 300° F.) and remain sharp even after the fabric is washed. Such creases however can be pressed out if desired.

Setting at temperatures in the range of 375° F. to 425° F. on a hot roll has resulted in fabrics that are di-

1. The evidence reflects that crease resistance of textile fabrics has long been sought in the textile industry, and various techniques have been developed going back at least to the 1920s for imparting

desired qualities of crease resistance to fabrics.

2. See Mathews, Textile Fibers, 1954 Edition.

mensionally stable to repeated washing and ironing.

In 1958 U.S. Patent 2,825,903 was issued to Miller. This patent discloses that a relatively permanent crease or dimple may be formed in a tie made of a fabric formed of a blend of natural and synthetic thermoplastic fibers by pressing at temperatures up to 450° F. Furthermore, the evidence reflects that there is considerable prior art dealing with the thermosetting resins employed to impart crease resistance to a fabric containing natural fibers such as cotton or wool. For instance, the 1960 British Patent 882,743 discloses a resin formulation which may be used in a blend of cellulosic and synthetic fibers to impart crease resistance. The resin of this patent is cured at temperatures between 212° F. and 390° F. In British Patent 916,698 it is disclosed that fabrics of the type taught in British Patent 882,743 may be creased by first drying the resin-impregnated fabric at temperatures in the curing range of the resin, thus producing an "at least partially cured fabric", then embossing, pleating or schreinering the fabric to deform same at temperatures of 284° F. to 410° F. and again heating to temperatures between 212° F. and 392° F. The Binkley Patent 2,933,409, filed in 1958 relating to a novel thermosetting resin, discloses that this resin may be used in a blend fabric to form "permanent creases" by curing the resin by means of a "conventional press at temperatures of between 212° F. and 392° F."

The evidence further reflects that it was generally recognized in the industry that in pressing a precured resin-impregnated fabric, in order to deform the thermoplastic constituent of the fabric, it was necessary to exceed the previous heat history of the fabric, or the temperature at which the fabric was cured. The testimony reflected that Arrow Shirt Manufacturing Company, in using resin-impregnated blend fabrics, knew that this could be done prior to 1963 and was using such a process in its manufacturing of shirts.

Thus, this Court concludes that the patent at issue does not disclose any new and useful process or improvement.[3] As a matter of fact, the plaintiff admits that pressing equipment capable of pressing up to 350° F. to 500° F. temperature range, which range was set forth in its claims, had been known and used more than a year before its "invention" date. The time mentioned in the patent at issue of 1–30 seconds for pressing the fabric had long been employed. Under such circumstances, the law is clear that a patentee cannot select "a range in a known progressive change and maintain a monopoly on products falling within that range on the ground that the designated range produces optimum results." Kwik Set v. Welch Grape Juice Co., 86 F.2d 945 (2nd Cir. 1936). As the Supreme Court many years ago stated in International Tooth Crown Company v. Gaylord, 140 U.S. 55, 11 S.Ct. 716, 35 L.Ed. 347 (1890):

> It is hardly necessary to say that it is no invention, within the meaning of the law, to perform with increased speed a series of * * * operations old in themselves;

and later restated in American Potato Dryers, Inc. v. Peters, 184 F.2d 165, cert. denied 340 U.S. 930, 71 S.Ct. 491, 95 L.Ed. 761 (4th Cir. 1950):

> It is not invention to point out the range of temperature and the velocity of air current at which the best results were to be obtained.

The situation presented by the evidence in this case was summed up by the court in Murray Company of Texas, Inc. v. Continental Gin Company, 264 F. 2d 65 (5th Cir. 1959):

> Nor can invention inhere in mere increased size and capacity because

---

3. 35 U.S.C. § 101: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the condition and requirements of this title."

"mere enlargement is not invention". [citing cases]

\* \* \* \* \* \*

What Brooks, and his employer, the Continental Gin Company, did was simply "to watch the advancing wave of improvement" and attempt to "gather its foam in the form of patented monopolies" which would enable them to "lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts." Atlantic Body Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 27 L.Ed. 438.

This Court further finds and concludes that the subject matter of the patent at issue was known and used by others in this country and described in printed publications before the alleged invention by the Pyke brothers. Under 35 U.S.C. § 102, one may not obtain a patent of subject matter known and used by others before the invention thereof.[4]

Furthermore, this Court finds and concludes that it was obvious long before the patent at issue was granted that those skilled in the art were able to select a pressing temperature, a pressure and a pressing time to obtain a desired crease. Even the plaintiff's testimony indicates that the selection of a pressing temperature above 350° F. was obvious prior to the issuance of the patent. What the Supreme Court stated in Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), is applicable. The quote in the *John Deere* case of the early Hotchkiss v. Greenwood case, 11 How. 248, 13 L.Ed. 683, is peculiarly appropriate in the case *sub judice:*

Unless more ingenuity and skill—were required than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity

which constitutes essential elements of every invention.

Thus, this Court concludes and now declares that the patent at issue is invalid and unenforceable; there can be no infringement of an invalid and unenforceable patent.

In accordance with the foregoing, it is the order, judgment and decree of this Court that the plaintiff have and recover nothing of the defendant in this case.

It is further ordered that the costs incurred in this proceeding be and they are hereby taxed against the plaintiff, for which execution may issue.

---

4. Under 35 U.S.C. § 102(b), one is not entitled to a patent if:
   "the invention was described in a printed publication in this or a foreign country \* \* \* more than one year prior to the date of the application for patent in the United States."