Alexis E. USHAKOFF and Stanley
A. Baron

v.

The UNITED STATES.

No. 2-58.

United States Court of Claims.

Jan. 24, 1964.

L. William Bertelsen, Boston, Mass.,
for plaintiff. William H. K. Donaldson,
Salem, Mass., and Kenway, Jenney &
Hildreth, Boston, Mass., were on the
brief.

Louise O'Neil, St. Paul, Minn., with
whom was Asst. Atty. Gen. John W.
Douglas, for defendant.

Before JONES, Chief Judge, and
WHITAKER, LARAMORE, DURFEE,
and DAVIS, Judges.

PER CURIAM.

This case was referred pursuant to
Rule 45 to Donald E. Lane, a trial com-
missioner of this court, with directions
to make findings of fact and recommenda-

tions for conclusions of law. The commissioner has done so in a report filed December 6, 1962. Briefs were filed by the parties, exceptions to the commissioner's findings of fact and recommended conclusion of law were filed by the defendant, and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. The court, therefore, concludes as a matter of law that patent No. 2,455,835 is valid; that the plaintiffs are the lawful owners of said patent; that the invention covered by said patent was used by defendant without authorization of the patent owners, and that plaintiffs are entitled to recover reasonable and entire compensation for such unauthorized use within six years prior to the filing of the petition, and judgment is entered to that effect. The extent of liability will be determined in further proceedings pursuant to Rule 38(c).

## OPINION OF COMMISSIONER

This is a patent suit under the provisions of Title 28 U.S.C. § 1498, in which plaintiffs seek to recover reasonable and entire compensation for the unlicensed use of a patented invention. Plaintiffs are the record owners of United States Letters Patent No. 2,455,835 naming Alexis E. Ushakoff as inventor. This patent was issued to plaintiffs on December 7, 1948, and will be hereafter identified as the patent. Plaintiffs contend that the claims of the patent have been infringed by the defendant's use of inflatable solar stills. Defendant contends that the patent is invalid and that it has not been infringed, since defendant asserts that it has a license to use the invention. The parties agreed to a separation of issues for trial and that the issues of infringement and validity would be determined first, and that the accounting issue would be determined at a later date.

The Ushakoff patent relates to a solar still which utilizes the sun's energy to convert salt water to drinking water. The solar still, which is designed for emergency use on life rafts, is inflatable so that it will occupy a minimum of space when not in use. The operation of the solar still is based on the principle that when salt water is evaporated, the salt remains as a deposit and the vapor is free of salt. The sun's energy is used to evaporate the salt water and the vapor is then condensed and removed from the solar still. This condensed vapor is free of salt and is safe for drinking.

The need for a means of providing drinking water on the open seas became apparent early in World War II when reports of the agonies faced by men cast adrift at sea were made known. During 1942 plaintiff Alexis E. Ushakoff, hereafter referred to as Ushakoff, became aware of the problem and began experiments to investigate the possibility of using solar distillation of sea water to provide drinking water. A short time later Ushakoff entered the employ of Higgins Industries as Director of Research and was charged with the responsibilities of developing a research department and working on projects then being developed at Higgins Industries. In negotiating his employment, Ushakoff informed Andrew J. Higgins, the head of Higgins Industries and hereafter referred to as Higgins, that he was working on several projects of his own, including specifically the solar still, and that as one condition of his employment it must be agreed that he would receive some share of the profits on these inventions. The condition was apparently accepted. The employment agreement was never reduced to a written contract.

After his employment by Higgins Industries, Ushakoff continued the development of the solar still along with his regular duties and he utilized Higgins Industries personnel and equipment. As the development of the solar still progressed, numerous experimental models

were constructed and tested. Frequently the models were submitted to the Air Corps, which was actively attempting to find an effective solar still. The Air Corps ran various tests and experiments on the solar stills in an attempt to determine if they were effective, and then reported the deficiencies to Ushakoff at Higgins Industries. As the development of Ushakoff's solar still proved more promising, the Air Corps encouraged Higgins Industries to continue working on it and entered a *purchase order* in September, 1944, for 15 solar stills to enable Higgins Industries to obtain a priority for the purchase of plastic film which was in short supply and was slowing down the development. After the priority was received, development proceeded at a much faster rate. While the contract called for 15 solar stills, some 36 were actually sent. These solar stills were delivered a few at a time, and, as the Air Corps comments were received, the solar stills were modified so that actually very few of the solar stills sent to the Air Corps under the contract were identical to any of the others. Even the last of the solar stills which were delivered to the Air Corps on February 5, 1945, incorporated improvements over those delivered in the preceding shipment. All of the solar stills delivered to the Air Corps up to February 5, 1945 were for tests and experiments of various sorts.

Early in 1945 Ushakoff further pressed Higgins for a written contract covering their agreement with respect to the inventions. A draft agreement was prepared by Ushakoff which Higgins refused to accept. Later, Higgins presented Ushakoff with a memorandum agreement which Ushakoff refused. Both proposed agreements called for the payment of royalties to Ushakoff, and neither of them called for an assignment of Ushakoff's patent rights to Higgins Industries. The relationship between Ushakoff and Higgins deteriorated rapidly and finally Ushakoff's employment was terminated on April 3, 1945.

Shortly thereafter both Ushakoff and Higgins filed patent applications on an early version of the solar still, and the Patent Office declared an interference between the two applications. During the interference proceedings Higgins abandoned the invention, and subsequently a patent covering this early version was issued to plaintiffs. Also, during the period immediately following the termination of his employment Ushakoff made several trips to Wright Field to help the Air Corps write procurement specifications on the solar stills and to attempt to get the contract for a company which he was setting up. However, a production contract was awarded shortly thereafter to Higgins Industries for 172,678 distillation kits. This contract was canceled by the Air Corps shortly after the end of the war, before Higgins Industries was able to make delivery.

The application for the patent here in suit was filed on February 4, 1946, and Ushakoff assigned 35 percent to plaintiff Stanley A. Baron for the benefit of Frederick A. Middleton, John J. Finnorn, and said Stanley A. Baron. Finnorn subsequently assigned his interest to Middleton and Baron.

The parties have stipulated that the defendant has procured at least one solar still, of the construction illustrated and described in the patent here in suit, within the period of 6 years prior to the filing of the plaintiffs' petition.

■■ The defendant alleges that the sale and delivery of solar stills to the Air Corps by Higgins Industries pursuant to the purchase order of September, 1944, constitutes a statutory bar to the grant of a valid patent under the provisions of Title 35 U.S.C. § 102(b), since at least some of the solar stills were delivered by January 18, 1945, which was more than 1 year prior to the filing date of the application for the patent in suit, February 4, 1946. It is not believed that this defense has been successfully made out. A use or sale for *experimental* purposes is an exception to the statutory

bar incurred by the use or sale of an invention prior to 1 year before the filing of a patent application. The purpose of the 1-year statutory bar is to prevent an inventor from obtaining profits on his invention for a number of years and then at a later date obtaining a patent. On the other hand, the law has recognized the necessity of allowing an inventor to freely experiment with his invention and permits such experimental use which is reasonably necessary to the perfection of the invention. Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1878). This exception has been recognized even in cases where the experimental use has resulted in incidental profit to the inventor. As stated in Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 125–126, 31 L.Ed. 141 (1887):

"A use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal and not the incident must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment."

■ It is clear from the evidence that all the parties to the purchase order of September, 1944, considered that it was entered to aid in the development of the solar stills and that the Air Corps' only intention was to obtain the solar stills for experimental purposes. There was no pretense that they were ready for actual use as lifesaving equipment; in fact, changes were continually being made in the solar stills to overcome defects reported by the Air Corps. Further evidence of the experimental purpose of the sales made under the purchase order is found in the continuing tests and experiments conducted by the Air Corps on the solar stills as they were received, in the fact that while the purchase order called for 15 solar stills, 36 were actually sent, and in the fact that the sales price of the solar stills was calculated to cover only labor costs and a small fraction of the cost of material. Thus, it is evident that the sale and use of the solar stills were motivated by experimental needs, and any profit was merely incidental to the overriding experimental purpose of the purchase order.

The defendant also alleges that it received a license from Higgins Industries to use the invention as part of the *production contract* of June 21, 1945, calling for 172,678 solar stills. A necessary presupposition to this allegation is that Higgins Industries had the right to grant such a license. There is no evidence of any assignment by Ushakoff to Higgins Industries of the patent rights to the invention, nor is there any evidence that Ushakoff agreed to make such an assignment of the invention. If Higgins Industries has any rights in the patent they must have arisen from the circumstances of Ushakoff's employment. The courts have, in certain circumstances, recognized the right of an employer to an assignment of his employee's invention even in the absence of an agreement to that effect in the employment contract. These circumstances require, however, that the employee be hired to secure certain defined results. Marshall v. Colgate-Palmolive-Peet Co., 175 F.2d 215 (3rd Cir. 1949). As explained by Mr. Justice Roberts:

"One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employ-

ment." United States v. Dubilier Condenser Corp., 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933).

■ Such circumstances have not been proved in the instant case. Ushakoff was employed as Director of Research by Higgins Industries, and at the time of his employment he made it known that he was working on several projects of his own and wanted to retain an interest in any profits obtained therefrom. Ushakoff's job involved the normal duties of a Director of Research as well as working on projects then being developed at Higgins Industries. The solar still project was initiated by Ushakoff on his own, and it was not until after Ushakoff's initial work that Higgins Industries became actively interested in it. Ushakoff was not employed for the purpose of inventing a solar still, and hence the circumstances of the instant case do not warrant a finding that Ushakoff was obliged to assign the invention to Higgins Industries. The circumstances of the instant case would appear to more correctly fall within the equitable "shop rights" doctrine which gives the employer the right to practice the invention because the employee developed the invention during the hours of employment and has used the employer's materials and equipment. However, it is unnecessary to decide here if Higgins Industries has acquired such a shop right, since this right does not carry with it the right to grant licenses. Therefore, defendant cannot rely for defense on any license or sublicense from Higgins Industries.

■ Finally the defendant alleges that it has an implied license from Ushakoff to use the invention as a result of Ushakoff's conduct in relation to the Air Corps. Defendant claims that Ushakoff did not give notice to the Air Corps that he was anything other than an agent for Higgins Industries nor that he claimed or intended to claim that he was the owner of the invention. It is not believed that this ground of defense is sustained by the evidence. When Ushakoff was in the employ of Higgins Industries it was natural that he should consider that his compensation for the invention would come from Higgins Industries, which would be manufacturing the stills for the Air Corps. Thus, it cannot be expected that Ushakoff would demand that the Air Corps take notice of his ownership of the invention during the period while he was employed by Higgins Industries. Further, there is no evidence that Ushakoff's conduct was other than would be expected of a person in his position nor that Ushakoff verbally or through silence attempted to give the impression that he would not claim his rights in his invention. In addition, the evidence shows that on May 31, 1945, shortly after he left the employ of Higgins Industries, Ushakoff wrote the Air Corps in an attempt to *establish and register* his ownership of the invention, and that on January 11, 1949, Ushakoff, through his attorneys, notified the Air Corps that it was infringing his patent. The May 31, 1945 letter was received and replied to by the Air Corps prior to June 21, 1945, the date of the formal production contract for the 172,678 solar stills, and both the May 31, 1945 letter and the January 11, 1949 letter were received considerably more than 6 years prior to the filing of this suit. The evidence shows that Ushakoff did not entrap the defendant into the infringement herein charged.

■ Summarizing, the patent here in suit, No. 2,455,835, is found to be valid; plaintiffs are found to be the rightful owners of the patent; Ushakoff's conduct is found not to have been such as would give the defendant an implied license to use the invention, and defendant's purchase of the solar still made in accordance with the patent is found to be an unlicensed use of plaintiffs' invention.

## FINDINGS OF FACT

1. This is a patent suit under Title 28 U.S.C. § 1498, for reasonable and en-

tire compensation for the unlicensed use by the defendant of plaintiffs' patented invention. United States Letters Patent No. 2,455,835, entitled "Inflatable Solar Still," issued December 7, 1948, to plaintiff Alexis E. Ushakoff, of Beverly, Massachusetts, and 35 percent to plaintiff Stanley A. Baron, of New Orleans, Louisiana, for the benefit of Frederick A. Middleton, John J. Finnorn, and said Stanley A. Baron, on an application for patent filed February 4, 1946, by plaintiff Alexis E. Ushakoff.

2. The parties agreed at pretrial to a separation of issues for trial, and that the issues of validity and infringement of the patent by the defendant be first determined upon full proofs, findings of fact, and argument of counsel. The parties further agreed that the accounting issue, including evidence as to the number of articles procured and/or the value of the patented invention, or the extent of the liability, if any, of the defendant and the amount of reasonable and entire compensation, if any, due to plaintiffs on account thereof, would be deferred until after the entry of the order of the court on the issues of validity and/or infringement.

3. Prior to the issuance of the patent, Alexis E. Ushakoff assigned 35 percent of his entire right, title, and interest in the patent to plaintiff Stanley A. Baron for the benefit of Frederick A. Middleton, John J. Finnorn, and said Stanley A. Baron. Finnorn subsequently assigned all of his interest in and to said patent to Baron and Middleton.

4. The patent, No. 2,455,835, which is the subject of this litigation, relates to an inflatable solar still for converting salt water to drinking water through the utilization of the sun's radiant energy. Briefly, the solar still is comprised of an outer transparent non-absorbent shell having a small bag mounted therein. Salt water is dripped through an opening in the outer transparent shell onto the surface of the bag, and the radiant energy of the sun which passes through the transparent shell evaporates the salt water, leaving the salt in the form of a deposit on the surface of the bag. The water vapor rises until it comes into contact with the inner surface of the transparent shell where the vapor condenses to water. This water, which is now free of salt, runs down the inner surface to the bottom of the transparent shell, where it is collected and removed.

5. The patent contains several illustrative drawings. Figs. 1, 2 and 4 are most representative of the type of solar still here in suit and are reproduced on page 675 of this report. The specification of the patent describes the solar still illustrated in Figs. 1, 2, and 4 in part as set forth on pages 675, 676.

"PATENT SPECIFICATION

"This spherical hollow body 10 carries between its upper and lower ends, a flange 11 to which is attached at one end a tow line 12, also attached to the water navigating conveyance. Designed to be encased by this hollow body 10, as by means of a cover, is another hollow body, preferably shaped like a bag with its throat portion inverted, which body, in one highly convenient form, is polyhedral in contour so as to be provided with downwardly converging sides 18 and 19, joined to upwardly convergent sides 16, 17, joined to oppositely including sides 14 and 15 converging upwardly at the top of the bag. This polyhedral configuration of the bag is maintained when it is fully distended, as shown in Figure 1, as it is designed to be collapsible, being made of a porous, heat absorbing, light weight flexible material, dark or black in color. The throat portion of the bag is designated 20, and has its perimetral edge secured as at 21 to the intermediate part of a funnel-shaped flexible body or member 27 which has both its larger and narrow parts secured as at 28 to the lower end of the hollow

Dec. 7, 1948.    A. E. USHAKOFF    2,455,835

INFLATABLE SOLAR STILL

Filed Feb. 4, 1946    2 Sheets—Sheet 1

body 10, which is open as at 30b at its south pole.

"The spout of this funnel shaped body 27 is designated 29, and is disposed directly over the opening 30b. It will be observed that the enclosures or space between the funnel shaped body 27, and the adjacent wall of the drum 10 constitutes a collection receptacle into which fluid may progressively collect. The sides of this funnel shaped body, as at 33, may freely flex into the interior 22 of the drum 10. An annular hollow ballast tube 25 is anchored by any suitable means so as to rest upon the inner surface of the upper part of the funnel shaped body 27, and

projecting into the said annular tube is the throat portion 20 of the inverted bag or hollow body 13.

"As a means of supporting the sides of the polyhedral bag in relation to the enclosing walls of the drum 10, I attach short flexible tie ropes or pieces 24, to indentable portions 23 of the inner surface of the drum 10, and also to the corners which join together angularly opposed sides of the bag. The bag is thus seen to be flexibly supported or jointed at its diverse corners to the drum or shell 10, while its throat portion 20 is attached to the drum at its lower end as already explained.

"At its upper end the bag 13 is also attached at one of its corners by a tie member 34 to the lower end of a salt or impure water distributor, conical in cross-section. There is accurately centered rigidly between the drum 10 and bag 13, the spout end of the raw water distributor because the lower part thereof is a funnel-shaped member 39, which is directly attached to the bag, while the upper closure section 40 thereof is also funnel-shaped and converges upwardly so as to be diametrically in alinement with a medial line of the shell 10. The distributor thus has a one point suspension means for the bag directly at its center line. Both funnel-shaped sections 39 and 40 of the impure water distributor have base flanges 42, 43 formed upon them, which are placed in abutting relationship so as to embrace the material of the drum 10, being fastened to the latter by means of the fasteners 43. Extending down into the top of the distributor member is a small funnel, the spout 44 thereof projecting into the hollow interior of the distributor in line with the innermost attached end thereof, while the outwardly flaring portion thereof, 45, projects beyond the distributor.

"The funnel-shaped flexible body 27 is formed in the vicinity of the inner surface of shell 10, with perforations 33 flanked by the outer surfaces of the ballast tube 25, as a means of allowing waters of condensation trickling down the sides of the inner surface of shell 10, to pass into the collection chamber 32. A flexible hose or tube 46 is connected at one end to the discharge end of the distributor, and at its opposite end it projects into the ballast tube interior 26, as at 47. Another flexible tube or hose 49 has one end thereof coupled as at 48 to the shell material 10, so as to communicate with the interior of the water collection chamber 32. At the outer end of this hose 49, is a tubular member 50 into which may be removably fitted a wedge shaped plug 52 attached by a string 51 to this tubular member 50.

"A string element 37 attached at its lower end to a part of the upper end of the bag 13, passes into a fixed guide tube located just below the distributor discharge spout, through the length of the distributor and comes out of the funnel inlet 45, at the upper end of the latter."

6. The parties stipulated at trial that the defendant procured at least one solar still made in accordance with military specification MIL–D–5850–C, dated June 6, 1955, within the period of 6 years prior to the filing of the plaintiffs' petition; that the construction of this solar still is in conformity with figure 4 of the military specification and with the construction illustrated and described in the plaintiffs' patent in suit. Plaintiffs' physical exhibit 10 is a solar still which purports to have been manufactured in accordance with the above military specification by Aquador Plastics, Inc., Brooklyn, New York.

## VALIDITY ISSUE

7. Defendant urges that the patent is invalid on the ground that the invention was on sale in this country more than 1 year prior to the date of the application for the patent, and that the

sale constitutes a statutory bar to the valid grant of a patent under Title 35 U.S.C. § 102(b). Defendant specifically relies upon the sale and delivery by Higgins Industries to the Air Corps, in conformity with *purchase order* 45–1547–E accepted by Higgins Industries on September 18, 1944, of solar stills made in accordance with the claims of the patent in suit on or before January 18, 1945, which was more than 1 year prior to February 4, 1946, the filing date of the application for the patent.

8. During the course of the development of the solar still, numerous experimental models were constructed and tested. Many of these models were submitted to the Air Corps for additional experimentation and testing.

9. The progress of Ushakoff's development of the solar still was limited by a shortage of plastic film. In order to accelerate the development, Higgins Industries sought a priority to purchase plastic, and for this purpose it arranged with the Air Corps for a purchase order to be entered calling for the delivery of 15 solar stills at a price of $60 each, which was calculated to cover only labor costs and a small fraction of the cost of material. There is evidence that in excess of $100,000 had been spent on research development and manufacturing of solar stills by Higgins Industries and Ushakoff prior to December 1944. On the basis of this purchase order, 45–1547–E of September, 1944, the desired priority was obtained.

10. The Air Corps authority for purchase dated July 21, 1944, which resulted in the purchase order noted in the previous finding, states that license rights should be considered and refers to Attachment A thereto which states that the purchase was to be an *experimental procurement* for comparative or service test.

11. Development work continued through the summer of 1944 to February 1945. On February 5, 1945, final models of solar stills, constructed in accordance with the patent in suit, were delivered to the Air Corps base at Eglin Field, Florida, for testing purposes. A total of at least 36 stills comprising a number of different models, was delivered in accordance with the following schedule:

| Date | Number Delivered |
|---|---|
| September 2, 1944 | 3 |
| September 16, 1944 | 3 |
| September 20, 1944 | 1 |
| October 13, 1944 | 1 |
| December 19, 1944 | 3 |
| January 8, 1945 | 9 |
| January 18, 1945 | 4 |
| February 5, 1945 | 12 |

12. All of the solar stills made and supplied after the purchase order of September, 1944, was entered, until February 5, 1945, were made as part of a development program aimed at producing a solar still acceptable to the Air Corps. All of these solar stills were in the development stage and were supplied to the Air Corps for testing and experimental use only.

13. Ushakoff was in communication with the Air Corps personnel with regard to the testing of the solar stills delivered after the purchase order of September, 1944, was entered. He was advised of various defects in the stills which he sought to eliminate in the construction of subsequent models. Even the last of the solar stills, delivered on February 5, 1945, incorporated improvements over those delivered in the preceding shipment.

14. Tests of the solar stills under actual rescue conditions at sea were conducted at Eglin Field during February of 1945. These tests, which were completed on February 19, 1945, established that the solar stills developed by Ushakoff and constructed as described in the patent in suit, were useful for their intended purpose. The final model of the solar still was submitted on February 5, 1945, and was approved by the Air Corps on February 25, 1945.

15. Not long after the February tests at Eglin Field, Higgins Industries was awarded a production contract for 172,-

678 distillation kits, three solar stills in each kit.

16. Summarizing the above findings on the issue of validity, it is found that the sale and periodic delivery of small numbers of solar stills in accordance with purchase order 45–1547–E of September, 1944, was a sale solely for experimental purposes, and that this sale did not invalidate the patent.

## LICENSE ISSUE

17. Ushakoff began the investigation of solar distillation and conducted preliminary experiments as early as 1942 on his own initiative and at his own expense.

18. Early in 1943 Ushakoff entered the employment of Higgins Industries, with the responsibility of organizing, equipping, and staffing a laboratory, and to advise Andrew J. Higgins, head of Higgins Industries, on technical matters and to work on projects then being developed at Higgins Industries. During the period of his employment Ushakoff continued the development of the solar still.

19. Development work on the solar still while Ushakoff was at Higgins Industries was initially at his own expense and on his own time. Subsequently Ushakoff interested his employer in the development, and further work was carried on largely at the expense of Higgins Industries, with Higgins Industries facilities, and with the assistance of Higgins Industries personnel, and partly also by Ushakoff on his own time and with his own facilities.

20. In the course of the preliminary negotiations regarding terms of employment, Ushakoff disclosed to Higgins his ideas on several projects including the solar distillation project and made it known that one condition of his employment would be an agreement providing that Ushakoff would receive some share of the profits on the inventions made by Ushakoff during the course of his employment. This condition was accepted by Higgins Industries, but the employment agreement was never reduced to a written contract.

21. After Ushakoff started working at Higgins Industries he sought on several occasions to obtain a written contract formalizing his employment agreement, but Higgins declined to enter into a written contract.

22. Early in 1945, after a patent application had been prepared and was ready for signature, Ushakoff again sought a written contract with Higgins Industries, pointing out that one was needed relating to the patent application. A series of meetings followed in which Higgins at first asserted that their oral agreement was sufficient. A draft agreement, however, was prepared by Ushakoff, which Higgins refused to accept, and later Higgins presented Ushakoff with a memorandum agreement which Ushakoff refused. Both proposed agreements called for the payment of royalties to Ushakoff, and *neither* called for an assignment of Ushakoff's rights to Higgins Industries.

23. There is no evidence of any agreement between Ushakoff and Higgins Industries obligating Ushakoff either to assign patent rights in his invention to Higgins Industries or to give to Higgins Industries the right to grant licenses to others to use Ushakoff's invention.

24. While Ushakoff was employed at Higgins Industries, Higgins was aware that Ushakoff asserted a claim of ownership of the patent rights on the solar still, and after his employment had terminated, Higgins was aware that Ushakoff was seeking to obtain a patent in his own name.

25. Both Ushakoff and Higgins filed patent applications on an early version of the solar still after Ushakoff's employment had terminated, and the Patent Office declared an interference between the two applications. During the interference proceedings, Higgins filed an abandonment of the invention, and subsequently a patent covering this early version was issued to the plaintiffs.

26. There is no evidence that Higgins ever sought an assignment of patent rights from Ushakoff on either the in-

vention of the earlier patent, No. 2,455,-834, or on the invention of the patent in suit, No. 2,455,835.

27. During the course of the development of the solar still, Ushakoff made many personal contacts with the people of the Air Corps Equipment Laboratory at Wright Field and Eglin Field. These contacts continued during the preparation of the Air Corps procurement specifications on the solar still, during a portion of which time Ushakoff was no longer in the employ of Higgins Industries. During this latter period, Ushakoff was also attempting to obtain a production contract for a company which he had set up, and at one meeting he was asked if he would be willing to give a free license to the Government if he received the contract to manufacture the solar stills. Ushakoff agreed to give the license if he received the contract; however, he was never granted a contract. There is no evidence that during any of these contacts Ushakoff verbally or through silence attempted to give the impression that he would not claim his right in his invention.

28. On May 31, 1945, Ushakoff wrote the Air Corps in an attempt to establish and register with it his ownership of the invention; and on January 11, 1949, Ushakoff through his attorneys notified the Air Corps that it was infringing his patent.

29. Summarizing findings 17–28, it is found that neither Higgins nor Higgins Industries is the owner of the patent in suit and that Higgins Industries has not been assigned or otherwise acquired an interest in the patent which would give it the right to license others to use the invention. It is further found that Ushakoff's conduct was not such as would give the Air Corps an implied license to use his invention.

## CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that patent No. 2,455,835 is valid; that the plaintiffs are the lawful owners of said patent; that the invention covered by said patent was used by defendant without authorization of the patent owners, and that plaintiffs are entitled to recover reasonable and entire compensation for such unauthorized use within six years prior to the filing of the petition, and judgment is entered to that effect. The extent of liability will be determined in further proceedings before a trial commissioner, pursuant to Rule 38(c).